# UNITED STATES DISTRICT COURT

### for the

### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| Nine Storage Bins of Materials Belonging to Johnny Ray GASCA and Kept in the Garage at the Home of Witness K.M. at 12843 Farnell Street, Baldwin Park, California 91706 | ) ) ) ) | Case No.   2:21-MJ-03889 |
| Described further in Attachment A-1 | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g) | Felon in Possession of a Firearm/Ammunition |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:*_____*)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Michael Fukuda
_____
*Applicant's signature*

Michael Fukuda**,** FBI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: Los Angeles, CA_____

Hon. Alka Sagar, United States Magistrate Judge
_____
*Printed name and title*

AUSA: Kevin B. Reidy, x8536

**<u>ATTACHMENT A-1</u>**

<u>PROPERTY TO BE SEARCHED</u>

Approximately nine storage bins containing property belonging to GASCA currently stored at K.M's residence located at 12843 Farnell Street, Baldwin Park, California 91706.

 

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of Title 18, United States Code, Sections 922(g) (Felon in Possession of a Firearm or Ammunition) (the "Subject Offense"), namely:

a.   Firearms or ammunition;

b.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

c.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show SMS text, email communications or other text or written communications sent to or received from any of the digital devices and which relate to the above-named violation;

d.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show instant and social media messages (such as Facebook, Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp), SMS text, email communications, or other text or written communications sent to or received from any digital device and which relate to the above-named violation;

e.   Records, documents, programs, applications, materials, or conversations relating to the sale or purchase of

guns or ammunition, including correspondence, receipts, records, and documents noting prices or times when guns or ammunition were bought, sold, or otherwise distributed;

     f.   Audio recordings, pictures, video recordings, or still captured images related to the purchase, sale, transportation, or distribution of guns or ammunition;

     g.   Contents of any calendar or date book;

     h.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations; and

     i.   Any SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offense/s, and forensic copies thereof.

     j.   With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

     i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

     ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v. evidence of the times the device was used;

vi. passwords, encryption keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii. records of or information about Internet Protocol addresses used by the device;

ix. records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2. As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II. **SEARCH PROCEDURE FOR DIGITAL DEVICE(S)**

3. In searching any SUBJECT DEVICE(S) (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.   The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.   The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant.  The government will not search the digital devices beyond this 120-day period without obtaining an extension of time order from the Court.

d.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

f.   If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.   If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.   If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.    The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.    After the completion of the search of the SUBJECT DEVICES, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

## **AFFIDAVIT**

I, Michael Fukuda, being duly sworn, declare and state as follows:

### I.   **PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of an application for a warrant to search the following items:

        a.   Approximately nine storage bins containing materials belonging to Johnny Ray GASCA ("GASCA") kept in the garage of the home of witness K.M. at 12843 Farnell Street, Baldwin Park, California 91706 (the "K.M. RESIDENCE"), as described more fully in Attachment A-1; and

        b.   Two firearms kept in the bedroom the K.M. RESIDENCE, as described more fully in Attachment A-2.

2.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 922(g)(1) (Felon in Possession of a Firearm or Ammunition) (the "Subject Offense"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

3.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested search warrant and does not purport to set forth all my knowledge of or investigation into this matter.  Unless specifically indicated

otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I have been a Special Agent with the FBI since September 2008.  From May 2015 through September 2019, I was assigned to a Criminal Enterprise Squad at the Los Angeles Field Office of the FBI, specifically, the Los Angeles Metropolitan Task Force on Violent Gangs.  From September 2019 to the present, I have been assigned to the Violent Crimes Squad, where I investigate violent crimes, including such crimes as Hobbs Act robberies, bank robberies, and kidnappings.

6.    Through my participation in kidnapping investigations, I have used a variety of investigative techniques, including reviewing physical evidence, reviewing surveillance images and cellular telephone data, and speaking with law enforcement agents and officers.  As a result of this experience and my conversations with other law enforcement personnel, including FBI Special Agents and local law enforcement detectives experienced in kidnapping investigations, I am familiar with the methods used by kidnappers and effective investigative methods to solve them.

## III. STATEMENT OF PROBABLE CAUSE

7.    Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    The United States Charges Johnny Ray GASCA with Kidnapping and Extortion and the FBI Searches for His Possible Accomplice**

8.    On July 20, 2021, the Honorable John E. McDermott, United States Magistrate Judge, signed a Criminal Complaint charging GASCA with Kidnapping, in violation of 18 U.S.C. § 1201(a)(2), in case number 2:21-mj-03889-DUTY (C.D. Cal.) (the "Complaint").  On August 3, 2021, a grand jury in the United States District Court for the Central District of California returned an indictment charging GASCA and co-defendant David Richard TSCHERNY ("TSCHERNY") with Kidnapping, in violation of 18 U.S.C. § 1201(a)(1), (a)(2), 7(3), and Interference with Commerce by Extortion, in violation of 18 U.S.C. § 1951(a), in case number 2:21-cr-00351-AB (C.D. Cal.) (the "Indictment").  Both the Complaint and Indictment are hereby incorporated herein by reference.

9.    As alleged further in the Complaint and Indictment, on July 19, 2021, at approximately 11:30 a.m., FBI received a report from the Department of Veteran Affairs Police Department ("VA Police") regarding a kidnapping that had occurred at the West Los Angeles VA Medical Center, 11301 Wilshire Boulevard, Los Angeles, California, 90073 (the "West LA VA"), at approximately 8:30 a.m.  The West LA VA is located on property over which the United States exercises concurrent jurisdiction and is within the special territorial and maritime jurisdiction of the United States.  GASCA abducted the victim, E.C., a 68-year-old woman with dementia, as she was walking to her car in the West LA VA parking lot with her friend.

10.  Video surveillance footage from the West LA VA showed
GASCA put his arms around E.C. and pushed her toward a gold-
colored pickup truck driven by TSCHERNY.  GASCA then picked E.C.
up and threw her into the rear passenger seat of the gold truck.
TSCHERNY then drove GASCA and E.C. to a JPMorgan Chase Bank
branch in Los Alamitos, California.  At the bank, GASCA
accompanied E.C. inside the bank while E.C. closed her bank
account and withdrew approximately $17,504.80.  TSCHERNY then
drove GASCA to Los Angeles International Airport ("LAX") where
GASCA attempted to purchase tickets to fly back to New York.
After deciding the tickets were too expensive, GASCA took E.C.
to a hotel in Hollywood.  Using cell phone location data for
E.C.'s phone, law enforcement converged on the hotel and learned
from hotel staff that GASCA had rented a room there for one
night.  GASCA was arrested while walking with E.C. on the street
outside his hotel later that day.

**B.   TSCHERNY Contacts the FBI, Identifies Himself as the
Driver of the Gold Truck, and Agrees to Be Interviewed**

11.  On July 21, 2021, the FBI received a call from
TSCHERNY who reported that he was the driver of the gold truck
involved in the kidnapping at the West LA VA.  TSCHERNY told the
FBI that he would be willing to meet with the FBI at his home in
Arizona.

12.  On July 22, 2021, FBI agents met with TSCHERNY at his
home in Kingman, Arizona.  After informing TSCHERNY that he was
not under arrest and was free to terminate the interview at any

time, TSCHERNY agreed to be interviewed.  In sum and substance, TSCHERNY stated the following during the recorded interview:

      a.   TSCHERNY told FBI agents that GASCA had contacted him a few days ago and asked if TSCHERNY would agree to pick GASCA up from LAX.  GASCA told TSCHERNY that he intended to rescue his girlfriend from some people who were holding her against her will.  GASCA also told TSCHERNY that he would be paid for his efforts.  TSCHERNY picked GASCA up from LAX on the at around midnight on July 19, 2021, and the two drove to a nearby pier where they remained until the morning.  That night, GASCA said that he knew that his girlfriend had a doctor's appointment at the VA hospital later that morning.  GASCA had a slip of paper from the VA with the appointment time.  GASCA and TSCHERNY planned to grab GASCA's girlfriend at that time.

      b.   Later that morning, on July 19, 2021, TSCHERNY and GASCA drove to the West LA VA and waited for GASCA's girlfriend.  At some point that morning, GASCA said that he saw his girlfriend.  GASCA got out of the truck, walked over to his girlfriend, and made contact with her.  TSCHERNY then drove the truck over to where GASCA and his girlfriend were standing.  TSCHERNY saw a commotion at the rear passenger door out of the corner of his eye as GASCA forced his girlfriend into the truck.  TSCHERNY then drove away from the Wilshire VA.

      c.   After driving away, TSCHERNY began to suspect that something was off with GASCA and E.C.  A few minutes after the abduction, and unbeknownst to GASCA, TSCHERNY activated the camera on his cell phone while it was mounted on his truck's

dashboard.  TSCHERNY made a total of three video recordings of GASCA and E.C. during their encounter.  Two of the videos were surreptitiously recorded and one was overtly recorded.

       d.    TSCHERNY told the FBI agents that GASCA told him to drive to a nearby Chase Bank branch so that GASCA could make a withdrawal from E.C.'s accounts.  E.C. told GASCA that she did not have her debit card, so GASCA told E.C. that they would need to go into the bank and speak to a teller in order to get the money.  GASCA then accompanied E.C. into the bank while TSCHERNY waited in the truck.  GASCA and E.C. returned to the truck a short time later and GASCA reported that Chase would not allow E.C. to close her accounts because she did not have proper identification.  GASCA told TSCHERNY to go to a local Social Security Administration office to get a new identification document for E.C.

       e.    TSCHERNY then drove GASCA and E.C. to the Social Security Administration office where E.C. was able to obtain a new identification document.  The three then drove back to the Chase Bank branch where GASCA and E.C. succeeded in closing E.C.'s accounts and withdrawing all of the account funds.

13.  TSCHERNY then took GASCA and E.C. to John Wayne International Airport in Santa Ana, California, purportedly so that GASCA could purchase tickets for he and E.C. to travel back to New York.  When they arrived at the airport, GASCA, E.C., and TSCHERNY got out of the truck and walked into the airport.  Not long afterward, GASCA decided there were not any flights suitable to get to New York, so TSCHERNY then drove GASCA and

E.C. to LAX.  TSCHERNY dropped GASCA and E.C. at Terminal 5 (Jet Blue) at LAX.  GASCA then paid TSCHERNY $1,000.  After making a couple of stops, TSCHERNY drove back to his home in Arizona.

14.  TSCHERNY also told the FBI that a mutual friend of his and GASCA's, K.M., had contacted TSCHERNY after the kidnapping and told TSCHERNY that he had seen a news article about GASCA's kidnapping of E.C.  K.M. told TSCHERNY to contact the FBI. TSCHERNY provided the FBI with K.M.'s contact information in case the FBI wished to speak with K.M.

### C.   K.M. Provides the FBI with Text Messages from GASCA in which GASCA Asked K.M. to Assist with Kidnapping E.C.

15.  On July 23, 2021, K.M. was interviewed at FBI Los Angeles, located at 11000 Wilshire Blvd, Los Angeles, California, 90024.  After being advised of the identity of the interviewing Agents and the nature of the interview, K.M. provided the following information:

16.  K.M. told FBI agents that GASCA had reached out to him about a week before the kidnapping to try to enlist his help in getting E.C. back.  K.M. showed agents text messages from GASCA from July 10- 11, 2021, in which GASCA told K.M., "Im going to LA next week. I need your help to get [E.C.] . . . I know where she will be at one morning, for an appointment . . . I need you to drive me. There is a parking lot and if I am walking around I might be spotted and the bitch taking her will pull off . . . Its in LA, Wilshire Blvd. They have no idea I know, so it will be a complete surprise . . . I'll only have this one chance to

do this right. I need you to pull yourself together to help me rescue [E.C.].  Ill be there in a week. Don't let me down."

17.  An hour later, GASCA texted, "About to buy my ticket. You stay with me next Sunday night, we leave Monday together early Monday morning to get [E.C.]. Can you do that?"  When K.M. backed off, GASCA responded "Handle your business. Im super sensitive right now too. I just found out where [E.C.] is going to be and I wanted you to help me get her, but ill handle it."

18.  On July 19, 2021, the day of the kidnapping, around 11:46 a.m., GASCA texted K.M., "I got [E.C.] back. No thanks to you."

**D.   GASCA Had Told K.M. to Hang onto Some Weapons and an Ammunition Clip for Him**

19.  K.C. also told FBI agents that, in 2018, GASCA had requested that K.M. go to his apartment in Hollywood, Los Angeles, and pack up his belongings.  GASCA explained that law enforcement had a warrant for his arrest, but if he could avoid arrest for three years, the statute of limitations on his case would run out.  GASCA believed law enforcement was about to conduct a raid at his apartment and did not want to risk being home when the apartment got raided.  K.M. went to GASCA's apartment that night and packed up his belongings into eight or nine storage bins.  Several of the bins had already been packed by GASCA.  K.M. then transported the bins to his residence and stored them in his garage.

20.  In the July 11, 2021, text exchange with K.M., GASCA told K.M. "As a matter of fact, even though it will make it hard

for me to get [E.C.] and I REALLY needed you this coming Sunday,
Fuck you. I've been way too good to you to have to kiss your
fucking ass. I'll get my stuff as soon as I can arrange to.
Cover those weapons good like I asked, so I don't see anything
that upsets me when I do get to go there, and put away my gun
clip so it doesn't get lost again."

### E.   K.M. Calls the FBI and Says That He Found a Box of GASCA's Stuff at His Residence

21.   On or around July 26, 2021, K.M. called FBI agents and
advised them that after meeting with the FBI on July 23, 2021,
he had looked through some of the storage bins containing
GASCA's belongings.  K.M. confirmed that he had looked through
GASCA's belongings of his own accord and not at the request of
FBI agents.  K.M. said that he had found two handguns in the
storage bins containing GASCA's belongings.

22.   On or about August 19, 2021, K.M. spoke with FBI
agents on the phone and advised them that, after discovering the
two firearms in GASCA's storage bins, K.M. had removed the guns
and placed them in his bedroom for safekeeping.  K.M. also
provided photographs of GASCA's storage bins and the two
firearms found in those storage bins to FBI agents.

### F.   GASCA Criminal History

23.   On August 13, 2021, I reviewed a criminal history
report for GASCA and learned that GASCA has previously been
convicted of the following felony crimes punishable by a term of
imprisonment exceeding one year:

a.   On or about December 4, 2006, a violation of Title 18, United States Code, Section 2319 (Criminal Infringement of a Copyright), in the United States District Court for the Central District of California, Case Number 2:03-cr-00419-DDP;

b.   On or about December 4, 2006, a violation of Title 42, United States Code, Section 408(a)(7)(B) (Falsely Representing a Social Security Account Number), in the United States District Court for the Central District of California, Case Number 2:03-cr-00419-DDP;

c.   On or about December 4, 2006, a violation of Title 18, United States Code, Section 875(d) (Interstate Communication of a Threat), in the United States District Court for the Central District of California, Case Number 2:03-cr-00419-DDP; and

d.   On or about December 4, 2006, a violation of Title 18, United States Code, Section 1513(b)(2) (Witness Retaliation), in the United States District Court for the Central District of California, Case Number 2:03-cr-00419-DDP.

## IV. <u>TRAINING AND EXPERIENCE ON FIREARMS OFFENSES</u>

24.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a.   Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in

places that are readily accessible, and under their physical control, such in their digital devices.  It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals.  Such information is also kept on digital devices.

b.   Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices.  These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

c.   Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.  This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price.  In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these

photos to each other to boast of their firearms possession
and/or to facilitate sales or transfers of firearms.

### V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

25.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been

---

[1] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

      c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

      d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously
develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

   26.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it is not always possible to search devices for data

during a search of the premises for a number of reasons, including the following:

    a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

    27.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

14

## VI. __CONCLUSION__

28.   For all of the reasons described above, there is probable cause the items to be seized described in Attachment B will be found in a search of the storage containers of GASCA's items described in Attachment A-1 and the two firearms described in Attachment A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
August, 2021.


_____
UNITED STATES MAGISTRATE JUDGE

15